## CHARLES BALL v. THE STATE.

*No. 3372.   Decided October 18.*

**1.  Murder—Self-Defense—Evidence—Case Approved.**—The defense on a murder trial proved the enmity of the deceased toward the defendant, threats uttered by him to kill the defendant, the defendant's knowledge of such threats, and the fact that the deceased commenced the fatal difficulty by making a violent attack upon the defendant.   In connection with this proof the defense proposed, but was not permitted, to read in evidence a certain postal card, telegram, and letters written by the deceased to the sister and brother-in-law of the defendant, the contents of which were known to the defendant.   The said documents disclosed the enmity of the deceased toward the defendant, the intensity of the same, and the cause thereof, and were offered by the defense to show the reasonableness of the defendant's apprehension of danger of death or serious bodily harm from the attack made upon him by the deceased.   *Held*, that the exclusion of the proposed evidence was error.   The rule is that under the plea of self-defense based upon threats, etc., made by the deceased prior to the homicide, the defendant, in order to show whether or not the grounds for fearing death or serious bodily harm were reasonable, is entitled to lay before the jury all circumstances which would go to show the character of the threats, the intention with which they were made, and the grounds of fear on which the defendant acted.   Russell's case, 11 Texas Ct. App., 288, approved.

**2.  Same.**—Over the objection of the defense the State was permitted to prove by the wife of the deceased that when deceased left his home on the night of the homicide he told her that he was going to the postoffice to get his mail, and would be back in a few minutes.   *Held*, that being irrelevant to any question at issue, the admission of the said testimony was error.

**3.  Same.—Charge of the Court** upon the issue of self-defense instructed the jury as follows:  "If you should find that the defendant armed himself with a pistol and went to the place where said Means was killed, with the intent to there meet the said Means, and to provoke a difficulty with him with the intent to take his life or do him a serious bodily injury, and if said Means came along where defendant was, but if when Means came up he made an attack upon defendant, without defendant having first done something reasonably calculated to provoke such attack, it became necessary for defendant to kill said Means to preserve his own life or to save himself from a serious bodily injury, and if for this purpose the defendant shot and killed said Means, then he can not claim a complete right of self-defense, but would be guilty of manslaughter."   In this case the proof shows that the homicide occurred on a public street, in front of the defendant's place of business, which to the knowledge of deceased he daily frequented; and further, that deceased when he attacked defendant had no knowledge that defendant was armed, nor reason to believe that defendant's presence at that place was hostile to him.   *Held*, that the charge, under the proof, was erroneous.   The rule is that the right of self-defense is not impaired by a mere preparation for the perpetration of a wrongful act, unheralded and unaccompanied by any demonstration, verbal or otherwise, indicative of the wrongful purpose.

**4.  Same.**—Under the proof in this case the court erred in omitting to instruct the jury that the defendant was not bound to retreat in order to avoid the necessity of killing his assailant.

APPEAL from the District Court of Cooke.   Tried below before Hon. D. E. Barrett.

The indictment charged the appellant with the murder of Joe Means, in Cooke County, Texas, on the 8th day of May, 1890.   His trial resulted

in his conviction for manslaughter, his punishment being assessed at a term of three years in the penitentiary.

The statement of facts in this case covers nearly two hundred pages of the record. But as the questions decided on this appeal relate only to the issue of self-defense, it is not essential that the whole of the testimony should be set out in this report. The brief of the counsel for the appellant summarizes the proof upon which the objection to the charge of the court was predicated. In connection with this summary a general statement of the nature of the proof will suffice.

The proof shows that the deceased was the proprietor of the Daily Hesperian, a newspaper published in the town of Gainesville, Cooke County, Texas; that Percy Darwin was the proprietor of the Daily Register, a newspaper published in the same town; that the defendant was an employe of said Darwin, at times acting as the editor of the Register; that a bitter rivalry existed between the said papers, which often found vent in vicious articles published in their respective columns. The two newspapers were published in adjoining buildings.

It was the theory of the State that a conspiracy existed between Percy Darwin, his two brothers, Dick and Leslie Darwin, the defendant, and one Frank Garner, the brother-in-law of the defendant, and that in pursuance of this conspiracy the deceased was waylaid at night in front of the Register office and shot and killed by the defendant. The brief of the defendant's counsel discloses the nature of the proof upon which the State sought to support its theory of conspiracy.

The several witnesses for the State who testified as to the actual shooting deposed that they saw the defendant and Dick Darwin standing against the wall and against an awning post in front of the Register office a few moments before the fatal shooting; that they saw the deceased come out of the Hesperian office and start towards the postoffice; that when he reached a point on the pavement in front of defendant he stopped; that defendant then fired the fatal shot. These witnesses, one and all, testified that they heard no altercation between the parties, and saw no demonstrations of any kind made by the deceased; that "he was doing nothing at the time he was shot." It was shown that the deceased was wholly unarmed at the time of the homicide.

The defensive proof on this issue was directly at variance with that of the State. Primarily it established oft repeated threats on the part of deceased to "horsewhip" and to kill the defendant; the positive knowledge of the defendant of those threats, and that because of the publication in the Register on that evening of an editorial reflecting upon the deceased, the deceased sent word to the defendant that he was going to horsewhip him, defendant, before morning, which message was delivered to defendant. Other defensive proof goes to show that the editorial referred to was not written by the defendant, but by Percy Darwin, and that

defendant went to the Register office that night to see Percy Darwin and get him to acknowledge to deceased that he, Darwin, and not defendant, was the author of the said editorial. According to the defendant's witness who saw the shooting, the defendant was standing in front of the Register office when the deceased came out of the Hesperian office. Upon discovering the defendant the deceased said to him, "You God damned black son-of-a-bitch, you know what I am going to do to you," and struck at him with his fist; that defendant, in warding off the blow, caught it on his arm; that deceased, repeating the epithet, rushed upon the defendant and again struck at or attempted to seize him, when defendant drew his pistol; that deceased then cursed defendant for drawing his pistol, rushed upon defendant, seized defendant's throat with his left hand, and threw his right hand to his hip pocket as though to draw a weapon, whereupon the defendant fired the fatal shot.

The defendant's first bill of exceptions discloses the matter involved in the first ruling of the court. From that it appears that the wife of deceased was the aunt of the defendant and his sister Mary; that the defendant strongly favored his sister's engagement to marry Frank Garner, and that deceased so bitterly resented and opposed that engagement that he became infuriated at defendant, his said sister, and Garner, and that the marriage of Garner and the defendant's sister intensified the deceased's anger at defendant and Garner. Having proved the frequent threats of the deceased to "horsewhip," "kill," and "run defendant out of town," and the deceased's message to the defendant on the night of the shooting —to "horsewhip defendant before morning"—the defense offered, but was not permitted, to read in evidence the letters, postal card, and telegram referred to in the opinion. Identified as written by the deceased, the postal card reads as follows:

"GAINESVILLE, TEXAS, 11—1, 1889.

*"Frank C. Garner:*

"SIR—Possibly you may have wedding cards printed and mailed. Should you send one to either myself or wife, I will consider it a personal insult, and will horsewhip you on receipt. 'Forewarned is forearmed.'
"Very respectfully,
"JOE MEANS."

The first letter referred to reads as follows:

"Frank C. Garner has just returned from Breese, Illinois, where he has been to see his best girl."

"DEAR MARY—The above is clipped from this evening's Register. Has Garner been to see you? What have you done on this subject? Are you going to marry him? Are you going to break off the match? I must know at once what your intentions are. You must not return here until you send his ring back, and fire him in good shape. If you marry him do not come to our house, but take up the alley with your corpse and go

to a cat fish boarding house, where your life will soon be ended. What do you think of the miserable cur keeping company regularly with Maude Moore up to two nights before you left, and telling her he was engaged to marry you, but did not know how in the world to break off the match? This is but one lie of a thousand he has told. I fear if this keeps up longer I will have to horsewhip him. On receipt of this return that pass, Mary, and please your mother. Not a person in this town will ever call on you when you return with him. He has not a dollar in the world save a part he stole from Gilcreest. His interest in the drug store will not pay expenses or last twelve months. If you must marry, for God's sake marry Schermerhorn or any decent man, but not a thief who is spurned by every one, and who has but one friend in town—Prudhomme. This is the last letter you will get from either of us till you fire him.

"JOE MEANS."

The second letter received by Mary Ball, then at Breese, Illinois, a few days prior to her marriage to Garner, reads as follows:

"Frank Garner and Mary Ball will be married at Breese, Illinois, November 28. Clear case of love at first sight."

"GAINESVILLE, TEXAS, 11—7, 1889.

"*Mrs. Garner:*

"Damn you for an infernal, deceitful, two-faced hypocrite! You now have to marry the corpse. See this local in this morning's Hesperian? Your brother and Garner have been around town to-day causing a great scandal by their inquiries, and I published this to ruin you both. Now that the whole town is laughing, I am happy. Damn you, keep your idiotic face out of my sight. Don't forget to work your father for every dollar you can. I send you extra copies for your friends.

"JOE MEANS."

The telegram referred to, received by Mrs. Garner at Breese, Illinois, on the day prior to her marriage, reads as follows:

"GAINESVILLE, TEXAS, Nov. 27, 1889.

"*Mrs. Frank Garner, Breese, Ill.:*

"Accept congratulations. Wedding present by express.

"JOE MEANS."

The wedding present referred to, received by Mrs. Garner a few days later, consisted of a package containing such clothing and trinkets as she had left at deceased's house, the clothes torn to shreds and the trinkets broken into fragments. The postal card, letters, telegram, and express package with its contents were shown by Mrs. Garner to her brother, the defendant, upon her return to Gainesville.

*Garnett & Eldredge, Stuart & McCans*, and *Potter, Potter & Eddleman*, for appellant.—Appellant relied upon self-defense, claiming that the killing was done without malice and in the necessary defense of himself from

real or apparent attack from the deceased, which threatened the destruction of his life or to do him some serious bodily harm.

On this line appellant introduced evidence of threats against him of the most violent character made by deceased, beginning about the 1st of November, 1889, and extending up to the evening of the killing, being often repeated under circumstances of great aggravation, calculated to excite alarm in the mind of appellant. The threats were sometimes addressed to appellant in the presence of other persons, sometimes to him when he was alone, and often sent to him through third parties.

It was shown that the deceased during this period tried to force appellant to leave town, often insulted him by applying to him the most abusive and offensive epithets, and sought in many ways to provoke the appellant to a difficulty with him; that during this period appellant lived in constant dread of deceased, often avoided him, and never voluntarily met him or went where he was—all of which evidence will be more specifically stated under appropriate heads in this brief.

In addition to this appellant proved that a few hours before the killing the deceased sent word to him that he would "horsewhip him before morning," which word was conveyed to appellant before the difficulty. Appellant also proved by eye witnesses to the killing that deceased began the difficulty by abusing and striking him, and by motions and gestures which were reasonably calculated to make appellant believe that deceased was about to put his threats into execution, or to do him some serious bodily harm.

The first error which we would urge upon the attention of the court relates to the exclusion as evidence of a certain postal card and two letters written by deceased, and other evidence set forth fully in appellant's first bill of exception.

For the better understanding of the important bearing which this evidence has in the case, it may be well to state that, while it appears that the immediate cause of the violent threat against appellant just before the killing was an article which appeared on that day in the Daily Evening Register, a newspaper published in Gainesville, and upon which the appellant worked, which article reflected upon the Hesperian, a daily morning paper published in Gainesville, and of which the deceased was owner and proprietor, yet back of this there was a deep and bitter enmity on the part of the deceased against appellant, his sister Mrs. Garner, and his brother-in-law Frank Garner, growing out of the marriage of the appellant's sister to said Garner, which occurred on the 28th day of November, 1889, which marriage the appellant favored and deceased bitterly opposed. The postal card offered in evidence was written by deceased a few days before the said marriage, and was addressed to Garner and sent to him through the mail, notifying him that should he invite deceased or his

wife to the approaching wedding, that he, deceased, would horsewhip the said Garner.

The first letter was written to Mrs. Garner by the deceased a short time before her marriage and seeks to persuade her not to marry Garner, and in this letter deceased abuses, reflects upon, and threatens Garner.

In the second letter, which is addressed to Mrs. Garner a few days before her marriage (though she is addressed as Mrs. Garner), the deceased curses and abuses Mrs. Garner, the appellant, and Garner in a most shameful and unmanly way, says he has ruined their happiness and is proud of it, and accuses appellant of creating a scandal.

The other evidence excluded by the court and embraced in the bill was to the effect that the day before her marriage Mrs. Garner received a telegram from deceased, congratulating her on her marriage and informing her that he had sent her by express a wedding present; that she received by express a package sent by the deceased which contained some of her own clothing, which she had left at the house of deceased, torn to shreds, and some of her trinkets chopped to pieces.

The postal card, the two letters above mentioned, and the other evidence relating to the express package were all offered in testimony by the appellant upon the trial of the case, and the State objected upon the ground that each and all of said evidence was irrelevant and immaterial, which objections were sustained by the court and the evidence excluded, to which the appellant excepted and reserved a bill.

We think this evidence clearly admissible and very important to the appellant. The appellant not only had the right to show the threats of the deceased against him, former insults and former efforts of deceased to draw him into a difficulty, but he had the right to show the nature, character, circumstances, and motive of each threat, insult, or former difficulty. To deny to a defendant the right to show and explain the character, the circumstances, and the motive of each threat, insult, or former difficulty would be, in many cases, to deprive him of the full force and legitimate effect of threats, insults, and former difficulties. The philosophy of the law on this subject has been well expressed by this court in the case of Russell v. The State, 11 Texas Court of Appeals, 288. In that case the doctrine is laid down with clearness and force that when a former threat or former difficulty is admissible at all, all the circumstances surrounding each threat or former difficulty are also admissible; that is, the *res gestæ* of such threat or former difficulty is a part of the same, and the proper weight or effect to be given such threat or former difficulty can not be determined by the jury unless they understand the nature, surroundings, and motives of same. Besides, the appellant had a right to inform the jury of the relations and feelings existing between himself and Means at the time of the killing, so that they might judge intelligently of the acts of Means from the stand point of the defendant.

When appellant was attacked by Means at the time of the killing, he had a right to view Means's conduct in the light of all his former acts and conduct which shed even the faintest light upon his conduct at the time; and if the jury were to view the transaction from the standpoint of the appellant, they could not intelligently do so without knowing themselves every fact which appellant knew. What did appellant know in reference to these matters which, by the ruling complained of, the jury was not permitted to know? He knew that in addition to the article in the paper the deceased was very hostile toward him on account of the marriage of his sister to Garner. He knew that in addition to the threats and insults offered him by deceased, deceased had been so enraged on account of said marriage that he had not only insulted Garner by the postal card, but that he had so far forgotten every manly and decent impulse that he had deliberately by a letter cursed and insulted a woman, and boasted that he had wrought her unhappiness, and seemed to derive from this fact a devilish sort of delight.

He further knew of the brutal conduct and heartless levity of deceased in regard to the wedding present to his sister. Knowing all these facts, how could he look upon Means as anything but a man driven to reckless desperation who would desire and do anything for vengeance sake? And knowing that the fury of deceased was likewise directed toward him as one who had contributed to his displeasure in the marriage, how was it possible for these things not to have a bearing upon the mind of appellant when he was attacked by Means? Did he not feel and believe that a man so frenzied that he would seek to insult and torture a girl on the eve of her marriage, and who entertained feelings as bitter against him on account of the same fact, would when aroused and when opportunity offered be utterly reckless of the life of appellant? If it is reasonable and probable that these things were so regarded by appellant, then it was proper for the jury to know and understand them, that they might judge his conduct fairly and correctly.

Our statute in reference to manslaughter requires that the provocation which shall produce the sudden emotion of the mind and be an adequate cause therefor must arise at the time of the killing, and the passion must not be the result of a former provocation. Yet while the provocation is thus limited by the cold letter of the statute to the time of the killing, the courts, without violating any rule of construction, have breathed life and humanity into this apparently harsh rule by holding that acts relied on as a sufficient provocation should be viewed and interpreted in the light of all former acts that would explain or color the main act in question. The wisdom and justice of this rule will not be questioned, and the same has often been recognized by this court. Miles v. The State, 18 Texas Ct. App., 156; Wadlington v. The State, 19 Texas Ct. App., 266.

This rule should apply with additional force when the evidence is in-

troduced to explain acts and conduct relied on as a complete justification for a killing.

The exclusion of this evidence deprived the defendant in a great measure of the right to show the origin of the trouble, the nature, extent, and intensity of the hatred of the deceased toward appellant and other members of his family, thereby largely nullifying the proper effect of his threats, insults, and efforts to provoke a difficulty. What could better show the malignant and bitter character of the hatred of deceased toward appellant and Garner and wife than the cool and deliberate act of writing a letter which exhibits a wickedness of heart rarely to be found among our species, or the unfeeling trifling in regard to the wedding present? Had the jury had the benfit of this evidence, would they not have been in a better condition to judge of the nature and the motive of the threats of the deceased? Would they not have had a more correct conception of how Means's conduct appeared to Ball on the night of the killing? If so, the evidence should have been admitted.

Suppose that Means had met Mrs. Garner, sister of the appellant, on the street, and prompted by his anger against her on account of her marriage to Garner—and which anger he also entertained against appellant, all growing out of the same cause—had spoken to her the vile and wicked words which he wrote, would this not have been admissible? If it would, upon what ground can the letters, which required a more fixed determination, be excluded? The same remarks also apply to the postal card.

The second error committed by the court upon the trial of this case which we call to the attention of the court is the admission of the testimony of Mrs. Means, the wife of the deceased. To enable the court to better understand the flagrant error committed in permitting this testimony to go to the jury, we refer to the fact that the appellant invoked in this case the doctrine of apparent danger, and his right to act upon it as it appeared to him. The doctrine was never more applicable to a case than this.

Appellant proved that deceased had threatened him, had insulted him on the streets, and had tried to run him out of town. He also proved that he was afraid of Means and avoided him. He also proved that a few hours before the killing deceased threatened to horsewhip him on sight, which threat was conveyed to him before the killing. He also proved by all the eye witnesses to the killing that deceased began and pressed the difficulty by cursing and abusing him and by striking him, and by other acts, motions, and threatening gestures that were reasonably calculated to induce him to believe that the deceased meant to do him some serious bodily harm.

The State sought to rebut this by proving that the deceased was unarmed at the time of the difficulty; that he had neither pistol nor horsewhip, and that he was on a peaceful mission, going to the postoffice. To

sustain this theory they proved by Mrs. Means that a short time before the difficulty the deceased left her at a point between their residence and the deceased's place of business, and when he left he told her that "he was only going to the postoffice and would be back in ten minutes." Other evidence showed that when Means came along where Ball was and raised a row with him, that he was going to the postoffice.

The appellant objected to the evidence as to what Means said to his wife, and also moved to have it withdrawn from the jury immediately after the witness uttered it, on the ground that it was hearsay; that appellant was not present, and had put no act of Means in evidence. These objections and motions were overruled by the court, and the said evidence was permitted to go to the jury, to which ruling appellant excepted and reserved a bill.

This identical question has been before this court on two different occasions, and each time the court has held that such evidence was inadmissible.    Brumley v. The State, 21 Texas Ct. App., 222; Johnson v. The State, 22 Texas Ct. App., 206.    In Johnson's case the court remarks that a second consideration of the question has only confirmed the judges in their opinion expressed in Brumley's case.    Both of these cases were reversed for this error.    This question itself is certainly decisive of this appeal, and we feel that we could safely rest the case here; but there are other questions which will again arise on another trial which should be determined now.    The error in admitting such evidence in this case is as obvious and as hurtful to the rights of appellant as in either of the above cases, and the reasons upon which the court held said testimony inadmissible in those cases apply with all their vigor and to their full extent in this case.    Indeed, it is a rare thing that a decided case can be found in such perfect accord with a case under consideration as the two cases already decided by this court and the case at bar.

It is no answer to this to say that the evidence may not have improperly influenced the jury.    The evidence was admitted for their consideration, and it would be trifling with the rights of a man to say that the jury never considered evidence that was admitted for their consideration. If they considered the evidence at all, and for any purpose, it was a wrong to the appellant, and when improper evidence is permitted to go to the jury on a vital issue in the case the court will not stop to inquire whether as a matter of fact the jury acted upon or was influenced by such evidence.    The court will not presume that improper evidence had no influence upon the jury.    The appellant was entitled to a verdict of a jury upon competent evidence alone.    Draper v. The State, 22 Texas, 400; Jones v. The State, 7 Texas Ct. App., 457; McWilliams v. The State, 44 Texas, 116.

The controlling question in the case was: Did it appear reasonable to appellant at the time he shot Means, viewing Means's acts from appel-

lant's standpoint, that Means was making an attack upon him which endangered his life or threatened to do him some serious bodily harm? And on a question so vital and so delicate, to make the appellant responsible for the statement of Means to his wife which was entirely unknown at the time to appellant, would be the very refinement of injustice and cruelty. But to make it doubly certain that this very thing should be done in this case, the special counsel who closed this case for the State repeatedly referred to this evidence in his closing remarks and urged its consideration upon the jury.

We next call the attention of the court to the error committed by the court below in giving the twelfth section of the instructions to the jury. In order to understand fully the bearing of this charge and our objections to it, it is necessary to state the conflicting theories of the case advanced by the State and appellant on the trial below.

The State's theory was that the killing was murder in the first degree, and the result of a conspiracy between appellant, his brother-in-law Garner, and Dick and Percy Darwin. To sustain this theory the State introduced evidence to show that the Hesperian and Register were two rival newspapers, published in Gainesville; that Means was the owner and proprietor of the former, and Percy Darwin was the owner and proprietor of the latter; that both newspapers had their offices on East California Street and in adjoining buildings, though the telegraph office was between the doors of the two offices, but was in the Register building; that a bitter rivalry had existed for some time between said papers, and bad feelings had arisen between the proprietors. The State also showed that the killing occurred about 8 o'clock at night, on the sidewalk in front of the Register office; that the Register office was not, as a rule, lighted up at night (though it was sometimes the case), the paper being an evening journal and the work being generally finished by 5 or 6 o'clock p. m.; that Dick Darwin, the brother of Percy Darwin, who also worked in the Register office, and Percy Darwin himself, and Leslie Darwin, the half-brother of Dick and Percy, and Ball, the appellant, were all at the Register office on the night of the killing, and that the office was lighted up that night, though said parties were not all there at the same time; that appellant and Dick and Leslie Darwin were there at the time of the difficulty, as was Frank Garner, who stepped out of the news stand just west of the Register office soon after the difficulty began, and during the difficulty told appellant to shoot deceased.

The State further claimed, though there was no certain proof of it, that the deceased when he went in front of the Register office where the difficulty occurred in which he was killed was on his way to the postoffice.

Frank Garner, the brother-in-law of appellant, lived in the north part of town, on North Dixon Street, and appellant lived with him and worked

at the Register office. Percy Darwin lived in the south part of town, on Lindsay Avenue.

One Cook testified for the State that he saw Ball, Garner, Dick Darwin, and a fourth party, who was rather a tall young man, about 6 o'clock p. m. on the day of the killing on the sidewalk on North Dixon Street, opposite the Belcher residence, engaged in conversation. This was intended to show that the parties were then engaged in perfecting their conspiracy to kill Means, but this evidence is utterly overthrown and destroyed by the evidence of Dick Darwin, Frank Sherwood, Herbert Eldridge, and Mrs. Garner.

Dick Darwin sent word to Ball, after Ball had gone home that evening, that Means said he was going to horsewhip him, Ball, on sight. That night Ball came down to town and met Dick Darwin on California Street, and they went to the Register office together. When they got there Leslie Darwin was there, but Percy had gone away. Dick left Ball there and started east down California Street to the Lindsay House privy, which led him past the Hesperian office. Before he got there he returned to the Register office, again passing the door of the Hesperian office. He did not see Means either time he passed the office. When Dick Darwin returned to the Register office, he, Ball, and Leslie Darwin stood about the Register office door a while, waiting for Percy Darwin to return. While they were there Means came along and the difficulty arose.

The witness Dick Darwin denied having any previous arrangement to meet his brother Percy at town that night, but claimed that they met at the Lindsay House without any previous understanding, and his brother asked him to go up and unlock the Register office door, as he had some papers there he wanted to get. The witness did this, and lighted up the office and went out on the street and saw nothing of his brother until after the killing. But Frank Sherwood, appellant's witness, testified that about 7 o'clock he was riding with Dick Darwin in a buggy, and Dick said he had to stop at the Lindsay House to see his brother Percy.

It also appeared that appellant was acting as local editor of the Register that week on account of the absence of Mr. Walker, and on the day of the killing an article appeared in the Register reflecting on the Hesperian, and that this made Means mad, as he thought Ball wrote the article, and when he told Dick Darwin to tell Ball that he, Means, was going to horsewhip him on sight Darwin did not explain to Means that Ball had not in fact written the article.

The State introduced no witness who claimed to have seen the difficulty itself and to know how it arose.

Appellant's theory of the case was that the killing was done in his proper self-defense; that he had entered into no conspiracy to kill Means; that he had laid no plans nor formed any intention to kill Means; that he was at the Register office that night for a proper purpose; that he was doing nothing to Means, and that Means attacked him under circumstances

which, if he was not placed in actual danger of loss of life or serious bodily harm, it reasonably appeared to him that he was, and that he acted on these appearances when he shot and killed Means.

To sustain this theory appellant proved that Means had been mad at him for some six months before the killing, and that Means threatened to cowhide him in the presence of Frank Carroll and Charles Merzbacher, in November, 1889.

About the same time Means sent Ball a note by the witness Kibbe, ordering Ball to leave town at once. Soon after this Means met Ball on the street and told him that if he did not leave town he would kill him.

A month or so before the killing Means passed Ball on the street and shook his finger in his face and called him a dirty puppy and threatened to whip him, and doubtless would have done so on the spot had not Ball gone away from him.

Ball was afraid of Means, often avoided him, refused to walk the streets where he was, and would not go to Means's house when requested without an officer to protect him. He often applied to the officers for protection and for permission to carry arms with which to defend himself against the threatened attacks from Means.

About two hours before the killing Means hailed Dick Darwin and told him to tell Charlie Ball that he was going to horsewhip him, Ball, on sight, as he had been writing about him. Means also told Paul Gallia a few minutes after this that he had sent such word to Ball, and that he meant to do the whipping that night, for if he did not his wife would talk him out of it when he went home. Somewhere about the same time in the evening Means sent one Stark, who worked in the Hesperian office, to look into the Register office to see if Ball was there, and said that he intended to whip Ball.

When Means sent the threat to Ball by Dick Darwin, Dick and Frank Sherwood were together on the east side of the square. They went from there down California Street to the postoffice, and there met Herbert Eldridge, and the three parties walked back up California Street to the square, and then up North Dixon Street, intending to go to Sherwood's house—Sherwood to get his supper, and the other two to get some pot flowers which Sherwood had promised to give them. On their way up Dixon Street Frank Garner overtook them. He was going home to supper, and as Ball lived at Garner's and was supposed to be there at the time, Darwin told him what Means had said to him in reference to Ball, and requested him to tell Ball. All four of the parties then went on together until they got to the Belcher building, when, after talking for awhile on the sidewalk, Sherwood, Darwin, and Eldridge crossed over to Sherwood's house and Garner went on. (These are evidently the four parties whom State's witness Cook saw.) Ball was not with these parties, nor did they see him anywhere on Dixon Street that evening.

Nothing was said about Means by any of these parties during their walk up Dixon Street except what occurred between Dick Darwin and Garner in a very brief private conversation, and all that was said in this was what Darwin told Garner about the threat which Means had sent to Ball.

In explanation of why Dick Darwin did not tell Means who wrote the article in the Register when Means made the threat to horsewhip Ball, Darwin stated that he knew that this article was in the paper, as he had read the proof, but he did not know but that there were other articles in the paper, some of which Ball may have written.

After getting the flowers, Eldridge and Darwin went down to Percy Darwin's and from there to their room. After getting his supper, Sherwood got in his buggy and went down to the room of Darwin and Eldridge, got Darwin in his buggy and drove to the Lindsay House, when Darwin got out to wait some little while until Sherwood should drive across the creek to see a young lady. Sherwood said that Dick Darwin told him that he would get out there, as he wanted to see his brother Percy, whom Sherwood had seen coming to town as they drove up Denton Street.

While Dick Darwin was at Percy's house, just before going to his room, he told Percy that Means was threatening to whip Ball about the article in the paper, and something was said about Percy coming up to town to explain that Ball had not written the article, but Percy's wife objected to his coming to town.

Soon after Dick got out of Sherwood's buggy at the Lindsay House, Percy Darwin came up and they went to the Register office, as heretofore explained, opened it and lighted it up, and Dick went out on the street and left Percy there. Dick went up California Street to within three or four houses of the square; he had no particular business, but was just walking about. He went into a billiard hall and stood a minute, and when he came out he saw Ball, Garner, and Mrs. Garner walking arm in arm (Mrs. Garner between the two gentlemen). They were just turning down the north side of East California Street, and Darwin started back east down California Street.

We will leave this branch of the case just here and return to Ball.

After his day's work was over Ball, as usual, went home between 5 and 6 o'clock. Garner, his brother-in-law, who was engaged in the drug business with the Williamses as his partners, and who had been absent for several days, returning about 4 p. m. of the day of the killing, came to his supper between 6 and 7 p. m. Mrs. Garner, at the time Garner came, was engaged in preparing supper and Ball was reading a paper. Garner told Ball what Dick Darwin had told him about Means's threat, and in addition that he had seen Means also, and Means said that he was going to kill him, Ball, at sight, and would stamp him, Garner, into the earth. Ball replied, "I don't see what Means wants to jump on me for; he must be mad about the article in the paper. I never wrote the article

and should not be blamed for it. Percy Darwin wrote it." Garner said, "Well, you had better prepare yourself and give him no advantage."

After eating supper Garner and wife and Ball started to town, as was usual with them. They walked three abreast, arm in arm, Mrs. Garner being in the middle. Just before leaving the house Ball put a pistol in his pocket, but Mrs. Garner did not know of this, nor did she know that there had been any new trouble between Means and her brother. These parties came down Dixon Street and turned down East California Street at the First National Bank corner. About the time they turned down California Street they saw Dick Darwin come out of a house in front of them and start on down California Street east. As soon as Ball saw Darwin he left Garner and wife and went on and overtook Darwin and passed on out of sight of Garner and wife, and Garner and wife saw nothing more of them, nor they of Garner and wife, until at the difficulty as hereinafter explained.

When Ball overtook Darwin he asked him about the threats, and Darwin told him what Means had said, and asked him if he was armed. Ball said he was. They went on down California Street until they got to the postoffice, when they crossed from the north to the south side of the street. About this time Ball remarked that he "did not want to go about the Hesperian office; that if Means wanted to horsewhip him, let him, Means, come to him, Ball." Darwin then told him that he thought Percy Darwin was down at the Register office, and Ball concluded that he would go down there and see Percy Darwin and see if he could not get Means pacified about the article. They went on to the Register office, and when they reached there they found that Percy had gone, but his little half-brother, Leslie Darwin, a boy about fourteen years old, was there, and he told Ball that Percy had gone up to the square and would be back in ten minutes. Ball stood around about the front door of the Register office waiting for Percy to return. He had been there only five or ten minutes when Means came out of the Hesperian office and started west up the street on the sidewalk passing in front of the Register office.

When Ball started to town that night he did not expect to see Means or the Darwins, but merely expected to walk down town with his sister and brother-in-law, as was his custom. On their way to town nothing was said about Means. It was the purpose of Garner and wife in coming to town to go to the postoffice, and then to the news stand, where they habitually went once a week to get some papers for which they were regular subscribers, and then to their drug store, where they would remain until time to go home. This was their custom.

After Ball and Dick Darwin went out of their sight Garner and wife went to the postoffice. They then crossed to the south side of California Street and went on down to the news stand, which was west of and adjoining the Register office. They noticed no one about the front of the

Register office as they entered the news stand. When they went into the news stand Garner asked Willis Neal, the proprietor of the same, if his, Garner's, papers had come. Neal replied, "None but Puck and The Judge." Garner paid for them and received back some change. Garner and his wife then went out, starting up to the drug store, but when they got to the door they saw Means and Ball engaged in a difficulty in front of the Register office, and Garner told his wife to go back in the house, which she did, and he went up to the scene of the difficulty.

After Means was killed Garner went back in the house, got his wife, and took her on to the drug store.

When Means was passing the Register office he saw Ball standing against one of the iron columns of the building, and turned and began to abuse him, calling him a black son-of-a-bitch, and struck him with his fist. Ball warded off the blow and Means struck him again. Ball then drew his pistol; did not shoot, but held it down by his side were Means could see it. Means again made a pass at Ball; some of the witnesses say it was a lick; others say he grabbed Ball's arm which held the pistol. Ball still did not shoot, and seemed to offer but little resistance. Means made another and fourth pass at Ball, as to the character of which the witnesses differ widely; some described it as a lunge, some say that it was a lick, and others that he grabbed at Ball with both hands. But it doubtless was an effort to grab Ball about the throat with the teft hand and either to strike him an underhanded blow with his right or to draw some weapon, as his right hand was thrown back about his hip or side. At least this is the way it appeared to some of the witnesses and to the appellant. At the instant of this motion Ball threw up his pistol and fired, and Means staggered and fell and died in a few minutes.

After Garner came out of the news stand, and while Means was abusing and assaulting Ball, Garner told Ball several times to shoot him, Means, or "give it to him."

During the difficulty Dick Darwin tried to stop it, and told Means that it was no place to have a row.

Frank Garner, at the time of this trial, was under indictment for the same offense, and for this reason was not permitted to testify in this case. Ball did not know that Garner was present at the difficulty until he heard him speak.

Leslie Darwin, who did not work at the Register office, explained his presence there that night as follows: He had been sent by Percy Darwin to take his buggy to the livery stable. On his return he went by the Register office, it being on his way, and found the office lighted and Percy Darwin in there. He asked Percy when he was going home; Percy replied, "In a few minutes." He then asked Percy if he could stay and go home with him. Percy told him he could. Percy then went out and told

him to wait there until he came back; that he was going up to the square and would be back in fifteen or twenty minutes.

While Percy was out Dick Darwin and Charlie Ball came in and asked for Percy. He told them what Percy had said about where he was going and when he would come back, and while they were waiting there for Percy Means came along and the difficulty occurred as before stated.

In explanation of why Ball held his pistol so long after he had drawn it without shooting, he stated that he thought if Means should see the pistol he would go away. Appellant also showed that the article in the paper was in reply to a dirty fling at the Register contained in that morning's Hesperian, and was not as insulting or aggravating as the article in the Hesperian.

Means was shown to be a much larger man than Ball.

With the evidence in this shape, the court in the said twelfth section instructed the jury, among other things, that if Ball armed himself with a pistol and went to the place of the difficulty with the intent to provoke a difficulty with Means in order to kill him, and if after he reached the place of the difficulty he did provoke Means to attack him, and he then shot and killed Means, he could not be justified on the ground of self-defense, but he would be guilty of murder.

That this is a correct proposition of law in the abstract is not denied, but that it was improper in this case and was calculated to injure the appellant is we think equally clear. The evidence relied upon to show that Ball armed himself and went to the place of the difficulty for the purpose of killing was not sufficient to raise even a shadow of suspicion, and a verdict based upon it could not have been sustained. The proof to the contrary was overwhelming. The one fact of Ball and Garner coming to town with Mrs. Garner under the circumstances disclosed in the evidence would itself entirely refute the State's theory, were its evidence twice as strong. If Garner and Ball started out to do a deadly deed that night and took Mrs. Garner with them, she being pregnant, then they have set at naught all the teachings of human experience as well as every natural impulse of the human heart, and have shown themselves to be monsters.

But there was absolutely no proof at all that Ball provoked Means to attack him, and there was not only the total absence of proof to this effect, but there was positive, affirmative, conclusive, and undisputed evidence that Means began the attack upon Ball without the shadow of an excuse or provocation therefor, and that Ball neither did nor said anything that could be distorted into a provocation for Means's murderous attack upon him. Not only this, but Ball did not even resist or defend himself against Means's attack until it was clear to him that the only way of safety was to shoot. Yet the court gravely submits the question of Ball provoking the attack.

It is true that the jury did not convict Ball of murder, but this charge was likely to have and doubtless did have an effect upon their minds to the injury of defendant. It was in effect saying to the jury that in the opinion of the court there is something in this case that will warrant you in finding that Ball provoked the attack, or at least there is some evidence in the case that Ball did provoke the attack; and when considered in connection with the fact that this proposition was again repeated by the court in the same section of the charge on the subject of manslaughter, it seems too clear that appellant was prejudiced thereby. Habel v. The State, 28 Texas Ct. App., 588.

But this is not the most serious objection to this twelfth section of the charge. In it the jury is told that "if Ball armed himself and went to where Means was killed with the intent to provoke a difficulty with Means in order to kill him or to do him some serious bodily harm, and if when Means came along he attacked defendant without defendant first having done something reasonably calculated to provoke such an attack, and the defendant shot and killed Means to protect himself from such an attack, then the defendant would be guilty of manslaughter."

We respectfully submit that this is not correct law in this or any other case. The clear meaning and effect of this charge is to punish a man for his hidden, undemonstrated intention to commit a crime—a thing the law does not tolerate. This question was fully and profoundly investigated and discussed by this court in the case of Cartwright v. The State, 14 Texas Court of Appeals, 486, and in accordance with the great weight of authorities, when critically examined, and in harmony with a sound and humane principle of justice, the court there held that something more must be done than merely going where the deceased was, with intent to provoke a difficulty, before the right of perfect self-defense can be abridged. This doctrine was approved and followed in the case of White v. The State, 23 Texas Court of Appeals, 154, and Meuly v. The State, 26 Texas Court of Appeals, 274.

In some cases the mere going to where the deceased is, under circumstances peculiar and aggravating, might itself be a provocation for an attack, but in those cases whether or not it is calculated to provoke a difficulty is a question of fact for the jury. In this charge the court tells the jury that even if Ball did nothing to provoke the attack, yet if Means attacked him without fault or wrong on the part of Ball, Ball could not have a perfect right of self-defense on account of his secret intent to commit a crime. Under the charge of the court Ball could not be justified, though he did not go where Means was, but only went to where Means was killed, a place he had a right to go. What harm does the secret intent do to society? If such existed in this case, no effort was made to put the purpose into action. It lay slumbering in the bosom of Ball, and the law can not drag it to light in order to punish it. This is carrying the doctrine of "whoso looketh upon a woman to lust after her hath already

committed adultery in his own heart" a little too far for mere human tribunals. The law can not, on account of the imperfection of the means and agencies it relies upon to ascertain truth, take cognizance of the un- heralded and hidden purposes of the human heart. Besides, until the purposes of the heart have been translated into obvious, living action, the law presumes that they may be changed and the wicked purpose aban- doned. And while the proof conclusively showed in this case that if Ball had ever conceived the purpose to kill Means, he fully and unmis- takably abandoned it, for when attacked he hesitated and refused to kill Means as long as there was any other hope of escape. Appellant requested the court, by a special instruction, to submit this latter view of the case to the jury, but the request was refused. It seems like a conviction was bound to be had in this case. If it could not be obtained upon what Ball had done, then it must be had upon what he might have thought.

This charge was excepted to at the time because it was not the law of the case. The error in giving it was made a ground for a new trial in the motion therefor. We think this is sufficient in the way of exceptions to justify the review of this error. We regard it as fundamental, it being the giving to the jury for law that which was not law, and that on a vital point in the case, and which clearly and necessarily influenced the jury in their deliberations. In addition to this, appellant, in a special instruction, requested the court to give to the jury the contrary of this proposition, which the court declined.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.— But one important issue is involved in this case, and that is the issue of self-defense. It is claimed by the defendant that he killed Means under a reasonable apprehension that Means was at the time in the act of killing him or of inflicting upon him serious bodily in- jury. In support of this defense it was proved that Means entertained enmity towards the defendant, and had repeatedly threatened to do him violence — had even threatened to kill him — and that these threats had been uttered from time to time for several months prior to the homicide, and reiterated just before the homicide, and that the defendant had knowl- edge of them at the time of the homicide. It was proved that the deceased commenced the difficulty which resulted in his death by a violent attack made upon the defendant.

In addition to the threats and the attack made upon him, the defend- ant proposed to read in evidence a postal card, two letters, and a telegram written by the deceased a short time previous to the homicide. These writings were not addressed or sent to the defendant, but to his sister and brother-in-law, but the defendant had knowledge of their contents before the homicide. They were offered in evidence for the purpose of showing

the cause of the enmity of the deceased towards the defendant, and the intensity of that enmity, and as tending to show the reasonableness of defendant's apprehension of danger of death or serious bodily harm from the attack made upon him by the deceased. Upon objections made thereto by the State, this proposed testimony was rejected, and the defendant reserved a bill of exception to the ruling of the court.

We are of the opinion that the testimony was admissible for the purpose for which it was sought to be used. It showed a bitter, unrelenting animosity on the part of the deceased toward defendant's sister and her husband, and also toward the defendant, engendered because of the engagement and marriage of defendant's sister, which engagement and marriage the defendant approved, but which the deceased bitterly opposed. It was important to the defendant that the jury should be fully informed as to the true cause of the enmity entertained by the deceased against him, and of the character of that enmity. Such information would enable the jury, in determining the issue of self-defense, to view the acts of the deceased from the defendant's standpoint. Without this information the jury could not view the circumstances of the homicide in the same light they were viewed by the defendant. Without it they could not know, as the defendant did, the settled, determined, and deadly character of the deceased's hatred toward him, and the true cause of that hatred. This testimony throws light, not only upon the motive actuating the deceased in attacking the defendant, but upon the conduct of the defendant upon that occasion, and the motive which actuated him to kill the deceased. It tends to show that he had reasonable ground to apprehend that the attack made upon him was intended by the deceased to be a deadly one. It gives character to the threats, motive, and conduct of the deceased toward the defendant, and also to the motive and conduct of the defendant. Russell v. The State, 11 Texas Ct. App., 288. We hold that the court erred in rejecting the testimony set forth in defendant's bill of exception No. 1.

Over defendant's objections the wife of deceased was permitted to testify that when deceased left home on the night of the homicide he told her that he was going to the postoffice to get his mail, and would be back in a few minutes. This testimony was irrelevant and inadmissible. It threw no light upon the homicide. Whatever may have been the purpose of the deceased in leaving home on that night, that purpose being unknown to the defendant, he could in no way be affected thereby. Brumley v. The State, 21 Texas Ct. App., 222; Johnson v. The State, 22 Texas Ct. App., 206.

Upon the issue of self-defense the court, among other instructions to the jury, gave the following: "If you should find that the defendant armed himself with a pistol and went to the place where said Means was killed, with the intent to there meet said Means and to provoke a difficulty with him with the intent to take his life or do him a serious bodily

injury, and if said Means came along where defendant was, but if, when Means came up, he made an attack upon defendant, without defendant having first done something reasonably calculated to provoke such attack, it became necessary for defendant to kill said Means to preserve his own life or to save himself from a serious bodily injury, and if for this purpose the defendant shot and killed said Means, then he can not claim a complete right of self-defense, but would be guilty of manslaughter." This instruction was excepted to by the defendant, and is here presented and insisted upon by his counsel as error.

Considered with reference to the evidence, we must hold the above quoted instruction to be erroneous.    Defendant's presence at the place where the killing occurred could not, under the circumstances, constitute provocation to the deceased.    Defendant had the right to be at that place.    It was a public street, and at the entrance to the house in which he did business.    It was his daily habit to be at the place, going to and from his work, and these facts were known to the deceased.    There was nothing wrong, nothing unusual or strange in his presence at the place on the occasion of the killing.    With what reason, then, can it be claimed that his presence at the place provoked, or was calculated to provoke, the deceased to attack him?    Nor did the fact that he went to the place armed constitute provocation, because deceased had no knowledge of that fact.    Nor did the deceased know or have reason to believe that the defendant had gone to the place with the intention to murder or inflict upon him serious bodily injury.    This is not a case in which the mere presence of the slayer at the place of the killing, armed with a deadly weapon and intending to kill or inflict serious bodily injury, should be considered as constituting provocation, and therefore a deprivation of the right of complete self-defense.    It is a case the facts of which bring it clearly within the reasoning and rule enunciated by this court in Cartwright v. The State, 14 Texas Court of Appeals, 486.    In that case the precise question under discussion was before this court and was maturely considered.    Reaffirming that decision, we refer to it as applicable to the facts of this case.

In instructing upon the issue of self-defense the learned trial judge omitted to tell the jury that the defendant was not bound to retreat in order to avoid the necessity of killing his assailant.    Such instruction should have been given, as it was a part of the law of this case as made by the evidence.    Penal Code, art. 573;  Willson's Crim. Stats., sec. 986.

Other questions presented in the record will not be determined, as they are such as will not necessarily, or even probably, arise on another trial.

Because of the errors we have discussed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Judges all present and concurring.